Moore v. Brooks, 2026 NCBC 6.

STATE OF NORTH CAROLINA

DURHAM COUNTY

KELLY F. MOORE, individually and
as Executor of the ESTATE OF
DRUE A. MOORE; MILES MOORE,
individually and on behalf of his
minor brother, COLE MOORE; KMC
MOORE LLC, as Trustee of the
REDWOOD TRUST, u/a/d April 10,
2017; and RICK GRAVES, as Trustee
of the REDWOOD LIFE
INSURANCE TRUST u/a/d
November 15, 2018,

            Plaintiffs,

v.

ROBERT SCOTT BROOKS and
WINTHROP INTELLIGENCE, LLC,

            Defendants.

ROBERT SCOTT BROOKS and
WINTHROP INTELLIGENCE, LLC

            Crossclaim
            Plaintiffs,

v.

REDWOOD WI HOLDINGS, LLC

            Crossclaim
            Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV001214-310

**ORDER AND OPINION ON
DEFENDANT BROOKS'S MOTION TO
DISMISS**

1. This matter is before the Court on the motion to dismiss filed by defendant Robert Scott Brooks pursuant to Rule 12(b)(2) and Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. (ECF No. 73). Brooks first seeks dismissal under Rule

12(b)(2), contending that this Court lacks personal jurisdiction over him. Alternatively, he seeks dismissal of two causes of action against him pursuant to Rule 12(b)(6), arguing that Plaintiffs have failed to state a claim for intentional infliction of emotional distress or for conversion.

2. The Court held a hearing on the motion on 26 September 2025. (ECF No. 96). Counsel appeared for Plaintiffs and Brooks and argued the motion.

3. Having considered the motion, the complaint, the arguments of counsel, and applicable law, the Court **DENIES** the motion for the reasons set forth below.

> *Ward and Smith, P.A., by E. Bradley Evans, Gavin B. Parsons, and Jordan Spanner, for Plaintiffs Kelly F. Moore, individually and as executor of the estate of Drue A. Moore; Miles Moore, individually and on behalf of his minor brother, Cole Moore; KMC Moore LLC, as trustee of the Redwood Trust, u/a/d April 10, 2017; Rick Graves, as trustee of the Redwood Life Insurance Trust u/a/d November 15, 2018; and Crossclaim Defendant Redwood WI Holdings, LLC.*
>
> *Everett Gaskins Hancock Tuttle Hash LLP, by E.D. Gaskins and James M. Hash, for Defendants Robert Scott Brooks and Winthrop Intelligence, LLC.*

Houston, Judge.

## I. BACKGROUND

4. The Court does not make findings of fact on a Rule 12(b)(6) motion to dismiss, nor is it necessary for the Court to do so on a Rule 12(b)(2) motion to dismiss. *See* N.C. R. Civ. P. 52. This is particularly the case for Rule 12(b)(2) motions in cases in which, as here, the original complaint is unverified and the defendant does not

introduce competent evidence contradicting the relevant allegations of the complaint. (*See generally* ECF No. 74).[1]

5.      Rather, the uncontroverted factual allegations of Plaintiffs' complaint are accepted as true for purposes of both motions under such circumstances. *Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 332 (2019) (well-pleaded factual allegations are accepted as true for Rule 12(b)(6) purposes); *Wyatt v. Walt Disney World Co.*, 151 N.C. App. 158, 163 (2002) (uncontroverted factual allegations are treated as true for Rule 12(b)(2) purposes); *Banc of Am. Sec. LLC v. Evergreen Int'l Aviation, Inc.*, 169 N.C. App. 690, 693 (2005) (explaining that, unless the defendant introduces an opposition affidavit or declaration, the court "must decide whether the complaint contains allegations that, if taken as true, set forth a sufficient basis for the court's exercise of personal jurisdiction").

6.      Thus, for background, the Court summarizes the complaint's relevant factual allegations and accepts them as true only for purposes of this Order and Opinion.

---

[1] Brooks attached to his brief a single unauthenticated exhibit: a copy of defendant Winthrop Intelligence, LLC's articles of domestication in the State of Wyoming, in support of his argument that Winthrop is now a Wyoming LLC rather than a Delaware LLC. (ECF No. 74.1, Ex. A). Brooks did not, however, authenticate the document or otherwise ask that the Court take judicial notice of it, (ECF No. 74 at 4 n.1), and the Court need not do so, as it is not an adjudicative fact, particularly where Plaintiffs otherwise affirmatively plead Winthrop's status as an out-of-state entity, regardless of whether its state of organization is Delaware or Wyoming. (ECF No. 3, ¶ 13); *see also* N.C. R. Evid. 201(a) (limiting judicial notice to adjudicative facts); *State v. Baskin*, 190 N.C. App. 102, 105 (2008) (citation omitted) (confirming that irrelevant facts need not be noticed). Regardless of whether Brooks's act of attaching the document, without moving for its admission or a request for judicial notice, otherwise constituted an attempt to introduce evidence for purposes of the Rule 12(b)(2) motion, the document does not controvert 221 of Plaintiffs' 222 allegations. Accordingly, the Court properly considers those uncontroverted allegations. *Inspirational Network, Inc. v. Combs*, 131 N.C. App. 231, 235 (1998).

7.     Drue Moore was a citizen and resident of Durham County, North Carolina until his death on 10 January 2025. Drue's family members resided with him and continue to reside in Durham County, North Carolina. (ECF No. 3, ¶¶ 7–10).

8.     Drue and his cousin Ben Moore formed defendant Winthrop Intelligence, LLC ("**Winthrop**") in 2009. Winthrop was formed as an out-of-state entity, though it is and was registered to do business in North Carolina with a principal office in Durham County, North Carolina. (ECF No. 3, ¶¶ 13, 40, 50).

9.     Winthrop's business model involves maintaining and selling access to a database with public records and other data concerning the salaries of college athletics coaches and similar information. (ECF No. 3, ¶¶ 2, 50). Winthrop regularly conducts business in North Carolina, remains registered with the North Carolina Secretary of State to do business in the state, and continues to maintain a mailing address in Durham County, North Carolina. (ECF No. 3, ¶ 40).

10.    Defendant Scott Brooks is a resident of Arizona and, at the time the complaint was filed, had been Chief Investment and Financial Officer ("**CIFO**") of Winthrop since around 2018. He was a long-time business partner of Drue Moore and Ben Moore and was previously involved in various business ventures with them. He also became Chief Financial Officer of their "family office" in 2019. (ECF No. 3, ¶¶ 3, 15, 81).

11.    In his role as CIFO, Brooks has overseen Winthrop's business operations in North Carolina, including receiving its mail in Durham County, and dealt extensively with Drue Moore as a resident of North Carolina. (ECF No. 3, ¶¶ 13, 38).

12. Over the course of approximately a decade, Scott Robinson, a Wyoming attorney and Winthrop's Chief Executive Officer, helped Drue create a series of Wyoming entities to protect his assets from future creditors. (ECF No. 3, ¶¶ 26, 55–57, 65, 68). These included a trust to be beneficiary of a life insurance policy on Drue's life, a trust to hold Drue's 50% interest in Winthrop, and an entity to hold Drue's interest in Teton Global Ventures, LLC, another Wyoming entity. (ECF No. 3, ¶¶ 26–28, 55–59, 60–61, 65–67).

13. Around 2020, Drue and Kelly deeded their ownership interests in their Durham, North Carolina residence to several of these entities. Brooks now insists that he has an ownership interest in those entities and asserts a claim to ownership of the Durham residence. (ECF No. 3, ¶¶ 68–71, 115).

14. Drue and Brooks's relationship deteriorated progressively until around September 2024, when Brooks and Robinson "accused Drue of taking millions of dollars in unauthorized distributions from Winthrop over several years." (ECF No. 3, ¶ 80). Soon after, documents purportedly written by Drue were discovered that admitted to the allegations of embezzlement. (ECF No. 3, ¶ 89). Plaintiffs contend that the documents "bore similarities to Brooks'[s] writing and to Brooks'[s] previous lawsuits" in which the defendants had also allegedly admitted wrongdoing via similar written admissions. (ECF No. 3, ¶ 89).

15. Over the following months, Brooks initiated and engaged in a series of ongoing communications and threats, including letters, emails, and text messages, directed to Drue in North Carolina. (ECF No. 3, ¶ 122). These communications

concerned Drue's assets, payments to Drue, and demands that Drue assign his assets (including his North Carolina assets) to Winthrop, Brooks, or other alleged creditors as reimbursement for his alleged misappropriations. (ECF No. 3, ¶¶ 122–27). Brooks also purportedly sought to negotiate settlement agreements with Drue. (ECF No. 3, ¶ 132).

16. Among other things, around 3 January 2025, Brooks sent a letter to Drue (i) purporting to terminate Drue's role in Winthrop and other entities, (ii) demanding disclosure of all of Drue's assets (including those in North Carolina), and (iii) threatening "criminal charges, possible arrest, and public proceedings" against Drue. (ECF No. 3, ¶¶ 132–36).

17. In addition, Brooks at various times "pressured Drue to direct Robinson to assign the assets" of several of the Wyoming trusts, including assets based in North Carolina or themselves holding assets based in North Carolina, as well as Wyoming-based entities. (ECF No. 3, ¶¶ 26–38, 127). Of those, at least one used Drue and Kelly Moore's Durham, North Carolina residence as its mailing address and did business in North Carolina, leasing vehicles and conducting other business using that address. (ECF No. 3, ¶¶ 31, 42). Another of the trusts maintained a life insurance policy on Drue's life, with Drue based in North Carolina, and the affected beneficiaries of the trusts—Kelly Moore, Miles More, and Cole Moore—were all North Carolina residents. (ECF No. 3, ¶ 34).

18. Brooks also sought to have Drue and Kelly Moore's personal residence in Durham County, North Carolina transferred to "Winthrop, Brooks," or other alleged creditors. (ECF No. 3, ¶¶ 7–9, 20–21, 36, 68–69, 104, 114–15, 127).

19. Ultimately, through his communications and pressure campaign, Brooks successfully compelled Drue to liquidate or assign many of his assets, including (i) brokerage accounts of approximately $1 million, (ii) a substantial promissory note, and (iii) a foreign investment property worth more than $165,000. Those assets were transferred to Brooks or entities under his control, along with "multiple luxury wristwatches" that Brooks demanded Drue ship to him. (ECF No. 3, ¶¶ 128–29).

20. The total value of the assets that Brooks successfully demanded that Drue transfer to him "exceeds the amount of unauthorized distributions allegedly taken by Drue or any debt owed by Drue." (ECF No. 3, ¶ 130).

21. Nonetheless, with his January 2025 letter, Brooks threatened to involve law enforcement, have criminal charges brought, and ensure Drue's potential arrest— presumably by local law enforcement—if Drue did not provide the requested information by 10 January 2025. (ECF No. 3, ¶ 132). Despite these threats, Brooks's statements were false, and he did not intend to involve law enforcement. (ECF No. 3, ¶¶ 134–36, 154).

22. On 10 January 2025—the deadline to comply with Brooks's demands—Drue committed suicide. (ECF No. 3, ¶ 36).

23. Since that time, Brooks has sought to recover assets from Drue's estate, attempting to divert those assets from Kelly Moore, Cole Moore, and Miles Moore. (ECF No. 3, ¶ 145).

24. Plaintiffs commenced this suit on 31 January 2025, (ECF No. 2), and filed their amended complaint approximately a month later, asserting causes of action for declaratory judgment, intentional infliction of emotional distress, conversion, unjust enrichment, breach of fiduciary duty, constructive fraud, constructive trust, and negligence. (ECF No. 3). This action was thereafter designated as a complex business case and assigned to the undersigned shortly after. (ECF No. 1).

25. On 28 July 2025, Brooks moved to dismiss the claims asserted against him for lack of personal jurisdiction, and, in the alternative, for failure to state a claim. (ECF No. 74).

26. The parties have fully briefed the motion, and the Court held a hearing at which Plaintiffs and Brooks were represented by their respective counsel of record. (ECF No. 96).

27. Plaintiffs have since voluntarily dismissed their cause of action for conversion. (ECF No. 80).

## II. ANALYSIS

28. Brooks argues that dismissal of all claims against him is appropriate pursuant to Rule 12(b)(2) and, in the alternative, that Plaintiffs' intentional infliction of emotional distress and conversion causes of action fail to state a claim under Rule 12(b)(6). The Court address each argument in turn.

**A. Brooks's Rule 12(b)(2) Motion to Dismiss**

    i.   Standard for Rule 12(b)(2) Motions

29.     Two principal authorities limit North Carolina courts' power to exercise personal jurisdiction: our state's long-arm statute, N.C. Gen. Stat. § 1-75.4, and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Shaeffer v. SingleCare Holdings, LLC*, 384 N.C. 102, 106 (2023) (citations omitted). However, the limits those authorities set are identical: the long-arm "statute makes available to the North Carolina courts the full jurisdictional powers permissible under federal due process." *Id.* (citation and internal punctuation omitted). Therefore, the Court need only analyze its authority under the Due Process Clause. *Inspirational Network*, 131 N.C. App. at 235 ("Our jurisdiction statutes are to be 'liberally construed in favor of finding that personal jurisdiction exists,' subject to the limitations of due process[.]"(internal citations omitted)).

30.     Under the U.S. Constitution, "a tribunal's authority [to exercise jurisdiction under the Fourteenth Amendment] depends on the defendant's having such 'contacts' with the forum State that 'the maintenance of the suit' is 'reasonable, in the context of our federal system of government,' and 'does not offend traditional notions of fair play and substantial justice.'" *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 592 U.S. 351, 358 (2021) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316–17 (1945)).

31.     Personal jurisdiction may be general or specific. General jurisdiction requires that a defendant have "affiliations with the State . . . so 'continuous and

systematic' as to render [the defendant] essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (citation omitted).

32.     Specific jurisdiction, on the other hand, is proper only when a defendant's "conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there" in connection with the particular claims at issue in a case. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) (citations omitted); *see also Ford Motor Co.*, 592 U.S. at 359. While such contacts need not be continuous and systematic, "random, fortuitous, or attenuated contacts" will not suffice. *Walden v. Fiore*, 571 U.S. 277, 286 (2014) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (internal quotation marks omitted)). Accordingly, the plaintiff's claims must arise out of or relate to "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Beem USA Ltd.-Liab. Ltd. P'ship v. Grax Consulting, LLC*, 373 N.C. 297, 303 (2020) (citation omitted).

33.     "Naturally, the parties' relationships with each other may be significant in evaluating their ties to the forum." *Rush v. Savchuk*, 444 U.S. 320, 332 (1980) (addressing co-defendants' relationship to forum state).

34.     Generally, the relationship between the defendant and the forum state "must arise out of contacts that the 'defendant himself' creates with the forum State." *Walden*, 571 U.S. at 284 (citation omitted). Thus, while the "unilateral activity" of the

plaintiff cannot create personal jurisdiction over a defendant, the defendant's own conduct in response to the plaintiff's actions can nonetheless create sufficient contacts for jurisdiction. *Id.* at 286 (citation and internal quotations omitted); *Schaeffer*, 384 N.C. at 103–15 (2023) (defendant's acts under employment agreement with plaintiff, including directing action in the forum state for the sake of the employer, were sufficient for jurisdiction); *Shively v. Aci Learning Holdings, LLC*, 2025 NCBC LEXIS 112, at *26–28 (N.C. Super. Ct. Aug. 27, 2025).

35.     Thus, the party initiating contact between the plaintiff and defendant is a "critical factor" in evaluating whether the defendant purposefully availed himself of the privilege of conducting activities in the forum state. *Banc of Am.*, 169 N.C. App. at 698 (citation omitted); *see Inspirational Network*, 131 N.C. App. at 241–42 (determining that defendant purposefully availed itself of the privileges of conducting business in North Carolina by initiating and voluntarily entering into an agreement with a North Carolina based corporation).

36.     For example, a defendant who "kn[ows] that [the] Plaintiff resides in North Carolina" and afterwards attempts to direct the plaintiff's actions therein may have enough non-unilateral contacts and target the forum state sufficiently for the exercise of jurisdiction. *Shively*, 2025 NCBC LEXIS 112, at *26–28 (concluding that jurisdiction existed where defendants knew plaintiff resided in state when they offered an agreement, defendants communicated with plaintiff asking that he perform services under the agreement, and plaintiff provided services as requested).

37.     A corporate officer or representative is not subject to jurisdiction merely because his company is. *Schaeffer*, 384 N.C. at 116 (citation omitted). Where, however, the individual personally participates in the conduct at issue, jurisdiction may be appropriate even if the conduct is otherwise performed in the course of his employment or corporate representation. *Brown v. Refuel AM., Inc.,* 186 N.C. App. 631, 637–38 (2007); *Shively*, 2025 NCBC LEXIS 112, at *26–28.

38.     In general, if a defendant challenges a court's personal jurisdiction, "the plaintiff has the initial burden of establishing *prima facie* that jurisdiction is proper." *Bruggeman v. Meditrust Acquisition Co.*, 138 N.C. App. 612, 615, (2000) (citations omitted).

39.     "Where unverified allegations in the complaint meet plaintiff's 'initial burden of proving the existence of jurisdiction . . . and defendant[s] . . . d[o] not contradict plaintiff's allegations in their sworn affidavit,' such allegations are accepted as true and deemed controlling." *Inspirational Network*, 131 N.C. App. at 235 (quoting *Bush v. BASF Wyandotte Corp.,* 64 N.C. App. 41, 45 (1983)) (other citations omitted); *Wyatt*, 151 N.C. App. at 163 (uncontroverted factual allegations are treated as true for Rule 12(b)(2) purposes); *Banc of Am.*, 169 N.C. App. at 693 (explaining that, unless the defendant introduces an opposition affidavit or declaration, the court "must decide whether the complaint contains allegations that, if taken as true, set forth a sufficient basis for the court's exercise of personal jurisdiction" (citation omitted)).[2]

---

[2] While Plaintiffs submitted an affidavit and evidence in opposition to Brooks's motion, the limited scope and nature of Brooks's challenge affects the scope of the Court's review and the

## ii. Personal Jurisdiction Over Brooks

40. In this case, Plaintiffs assert that the Court has specific personal jurisdiction over Brooks arising from the subject matter of their complaint. They argue that Brooks purposefully availed himself of jurisdiction in North Carolina by sending messages to and negotiating with Drue Moore, a resident of North Carolina, directing and demanding Drue Moore's conduct in North Carolina, and controlling or attempting to control real property and other property located in North Carolina. (*See generally* ECF No. 3). Plaintiffs also contend that Brooks availed himself of the privilege of conducting activities in North Carolina in his capacity as CIFO of Winthrop, a company that does business in North Carolina, by taking various actions on its behalf with respect to Drue Moore and assets in North Carolina. (*See generally* ECF No. 81).

41. Brooks does not challenge the numerosity or significance of his contacts with North Carolina, and his counsel conceded as much at the hearing before the Court. Brooks merely contends that the contacts were created by Drue Moore, rather than Brooks, and that his conduct was on behalf of Winthrop, such that Brooks did not

matters properly considered. As noted above, Brooks did not introduce competent evidence contradicting the relevant allegations of the complaint, and the scope of his challenge is therefore to the legal sufficiency of the factual allegations of the complaint—not as to the merits of the underlying facts. Thus, Plaintiffs are not entitled to supplement the allegations of their complaint by an affidavit accompanying their responsive brief. *Banc of Am.*, 169 N.C. App. at 693 (explaining that, where "the defendant makes a motion to dismiss without submitting any opposing evidence . . . '[t]he allegations of the complaint must disclose jurisdiction although the particulars of jurisdiction need not be alleged.' The trial judge must decide whether the complaint contains allegations that, if taken as true, set forth a sufficient basis for the court's exercise of personal jurisdiction." (internal citations omitted)); *Williams v. Inst. for Computational Stud. at Colo. State Univ.*, 85 N.C. App. 421, 428 (1987) (citation omitted). Even if the Court were to consider Plaintiffs' submissions, however, the Court's resolution of the motion would be the same.

purposefully avail himself of jurisdiction in North Carolina. (ECF No. 74 at 8–13; Hr'g Tr. 7:10–14 (Sept. 26, 2025) ("There are North Carolina ties here, Your Honor, that they're in the record and they're undeniable, but we think that, as reflected in the artifacts that plaintiffs put in the record, Your Honor, these North Carolina ties were all created by Mr. Moore, not by Mr. Brooks.")).

42. The Court concludes that the totality of Brooks's alleged conduct is sufficient to subject him to jurisdiction before this Court.

43. Brooks admits in his briefing that "Plaintiffs' allegations can be read as suggesting that Mr. Brooks, personally, is claiming an interest in assets in North Carolina and that should subject him to jurisdiction here." (ECF No. 74 at 12). But Brooks asserts that he "does not claim personal ownership in such assets." (ECF No. 74 at 12–13). Where he has failed to tender an affidavit or other competent evidence in opposition to the relevant allegations of Plaintiffs' complaint despite ample opportunity to do so, however, Brooks may not use his brief to contradict the allegations of the complaint. *Inspirational Network*, 131 N.C. App. at 235; *Wyatt*, 151 N.C. App. at 163; *Banc of Am.*, 169 N.C. App. at 693.

44. Similarly, Brooks contends in his briefing that he "was not dealing with Drue because Drue was in North Carolina [but] was dealing with Drue in North Carolina because [Drue] was affiliated with Winthrop and happened to be in North Carolina." (ECF No. 74 at 12). Again, without putting on contradictory evidence, Brooks attempts to have the Court reach inferences that contradict the plain factual allegations of the complaint.

45. Taking the complaint as true, Brooks voluntarily associated himself with Winthrop and acted in many respects on behalf of Winthrop *in addition to* acting on behalf of himself individually. (*See, e.g.,* ECF No. 3, ¶¶ 3, 116–36). As CIFO, Brooks oversaw Winthrop's business operations in North Carolina, including receiving its mail in Durham County, and dealt extensively with Drue Moore as a resident of North Carolina. (ECF No. 3, ¶¶ 13, 38).

46. As Plaintiffs allege, in making demands of Drue, Brooks attempted to effectuate the transfer of ownership of Drue and Kelly Moore's personal residence in Durham County to Brooks personally or to Winthrop (a North Carolina entity), among others. (ECF No. 3, ¶¶ 7–9, 20–22, 36, 68–69, 104, 114–15, 127). Brooks also compelled Drue to (i) ship items to Brooks from North Carolina, and (ii) liquidate his brokerage accounts and similar assets for the benefit of Brooks or Winthrop. (ECF No. 3, ¶¶ 128–29).

47. Knowing that Drue resided in North Carolina, Brooks (i) attempted to negotiate a settlement agreement with Drue, (ii) demanded that Drue transfer North-Carolina-based assets, (iii) fired (or purported to fire) Drue from his role with Winthrop (a business operating, and with its principal place of business, in North Carolina) and other entities, and (iv) directed demands and threats to Drue in North Carolina, with the intent and expectation that Drue would act on those demands in North Carolina. (ECF No. 3, ¶¶ 122–36).

48. Importantly, in making his demands of and threats against Drue, Brooks threated to involve law enforcement—it is reasonable to infer *North Carolina* law

enforcement—and to have law enforcement charge and arrest Drue. (ECF No. 3, ¶¶ 132–36). With Brooks's knowledge that Drue lived in North Carolina and with his communications focused on North Carolina, Brooks implicitly and intentionally invoked the authority of law enforcement[3] to increase the realism and impact of his threats, even if he ultimately did not intend to carry through on those threats. (ECF No. 3, ¶¶ 132–36).

49. Then, "as a result of Brooks'[s] persistent and threatening actions" (i.e., the foregoing communications, threats, demands, and other conduct directed to Drue in North Carolina), Drue committed suicide, (ECF No. 3, ¶ 136), and Drue's death and the other conduct of Brooks directly led to the litigation in this case.

50. Inasmuch as Brooks argues that the contacts underlying Plaintiffs' cause of action for intentional infliction of emotional distress are insufficient to support personal jurisdiction, (Hr'g Tr. 6:11–7:9), applicable case law indicates otherwise.

51. Intentional tortious conduct originating outside the forum can amount to purposeful availment of the privilege of conducting activities in the forum when the tortfeasor directs conduct—including communications—into the forum. *See Calder v. Jones*, 465 U.S. 783, 788–90 (1984) (determining that jurisdiction was proper in California where defendants' "intentional, and allegedly tortious, actions were expressly aimed at California"; defendants allegedly defamed plaintiff in an article

---

[3] Given that law enforcement would need jurisdiction over Drue and that applicable North Carolina law would presumably govern under the circumstances of this case, as noted above, it is reasonable to infer for pleading purposes that Brooks therefore invoked the threat of action by local North Carolina law enforcement (and, thus, the application of North Carolina law). (*See* ECF No. 3, ¶ 132).

"drawn from California sources" that "concerned the California activities of a California resident," and defendants knew that harm would result to plaintiff in California, largely due to circulation of their magazine in California); *Brown v. Ellis*, 363 N.C. 360, 363–64 (2009) (per curiam) (concluding personal jurisdiction existed in alienation of affections and criminal conversation action where defendant initiated telephone and email conversations with plaintiff's wife, who resided in North Carolina, "on an almost daily basis"); *see also Vishay Intertechnology, Inc. v. Delta Int'l Corp.*, 696 F.2d 1062, 1068–69 (4th Cir. 1982) (concluding that allegedly tortious telephone calls and letters directed at plaintiff in North Carolina sufficed to establish personal jurisdiction).

52. Under the circumstances, the Court concludes that Plaintiffs have sufficiently carried their burden to demonstrate that Brooks could have, and should have, "reasonably anticipate[d] being haled into court" in North Carolina in connection with claims asserting that his conduct was wrongful and that he has sufficient minimum contacts with North Carolina. *World-Wide Volkswagen*, 444 U.S. at 297 (citation omitted); *see Shively*, 2025 NCBC LEXIS 112, at *26; *Schaeffer*, 384 N.C. at 108–13; *see also Calder*, 465 U.S. at 791.

53. Because Plaintiffs have satisfied their burden of demonstrating specific jurisdiction over Brooks, the Court **DENIES** Brooks's motion to dismiss pursuant to Rule 12(b)(2).

**B. Brooks's Rule 12(b)(6) Motion**

54. With the Rule 12(b)(6) portion of his motion, Brooks moves to dismiss Plaintiffs' causes of action for (i) intentional infliction of emotional distress and (ii) conversion.

55. In ruling on a motion to dismiss for failure to state a claim, the Court must determine "whether the allegations of the complaint, if treated as true, are sufficient to state a claim upon which relief can be granted under some legal theory." *Corwin v. Brit. Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (citation omitted).

56. Dismissal is appropriate if "(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim." *Id.* (citation omitted).

57. The Court must treat the well-pleaded factual allegations as true and view them "in the light most favorable to the non-moving party." *E.g.*, *Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 332 (2019) (citation omitted).

i. Intentional Infliction of Emotional Distress

58. To state a claim for intentional infliction of emotional distress, a plaintiff must allege "(1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress to another." *Dickens v. Puryear*, 302 N.C. 437, 452 (1981) (citations omitted)).

59. "Extreme and outrageous conduct is defined as conduct that is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds

of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Norton v. Scotland Mem'l Hosp., Inc.*, 250 N.C. App. 392, 397 (2016) (quoting *Smith–Price v. Charter Behav. Health Sys.*, 164 N.C. App. 349, 354 (2004)).

60. "A defendant is liable for this tort when he desires to inflict severe emotional distress or *knows that such distress is certain, or substantially certain, to result from his conduct* or where he acts recklessly in deliberate disregard of a high degree of probability that the [emotional] distress will follow and the mental distress does in fact result." *Id*. at 398 (quoting *Dickens*, 302 N.C. at 449 (emphasis in original)).

61. However, "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" do not rise to that level. *Briggs v. Rosenthal*, 73 N.C. App. 672, 677 (1985) (citation omitted); *Turner v. Thomas*, 369 N.C. 419, 427 (2016) (clarifying that North Carolina "has set a 'high threshold'" for extreme and outrageous conduct (citation omitted)).

62. Here, Defendant contends that Plaintiffs have failed to plead facts demonstrating either extreme and outrageous conduct or causation. (ECF No. 74 at 14–18). The Court concludes, however, that plaintiff Kelly F. Moore, as executor of the Estate of Drue A. Moore, has adequately stated a claim upon which relief can be granted.[4]

---

[4] Though it does not expressly state as much, the first amended complaint implies that this cause of action is asserted only on behalf of Kelly Moore, as executor of Drue's estate, in that it contends only that (i) the emotional distress was to Drue and (ii) it seeks and asserts that damages are appropriate only as to "Kelly, as executor of Drue's estate." (ECF No. 3, ¶¶ 157–60). Plaintiffs confirm in their briefing that they assert this as "Kelly's IIED claim," which the Court construes to reference Kelly in her official capacity as executor. (ECF No. 81 at 24). No other party has stated such a cause of action, and the Court accordingly construes it as asserted only on behalf of Kelly Moore in her official capacity as executor.

63.    Inasmuch as Plaintiffs allege in their briefing that "Brooks *falsely* accused Drue of taking millions of dollars from Winthrop" or falsified documents suggesting that Brooks did so, the complaint lacks factual allegations that match these arguments, and the paragraphs cited by Plaintiffs do not support the contentions. (ECF No. 84 at 25 (citing ECF No. 3, ¶¶ 80–83, 88–89) (emphasis added)). Rather, in their complaint, Plaintiffs allege that they "have not located documents substantiating the amount of these unauthorized distributions, or that they even occurred" and that "no documents substantiating the existence or amount of the alleged unauthorized distributions have been provided to Plaintiffs." (ECF No. 3, ¶¶ 88–89).[5]

64.    Plaintiffs' allegations that they have not located documents and that Defendants have not provided documents supporting Brooks's contentions that the distributions were unauthorized (i) are not factual allegations that Brooks's demands were actually false and (ii) fail to create a reasonable inference that Brooks fabricated the basis for his demands.

---

[5] The Court observes that, in their briefing, Plaintiffs take liberty with certain of their characterizations of the complaint's allegations. For example, in addition to the foregoing, Plaintiffs assert in their briefing that "*Brooks drafted documents*, intended to appear as if by Drue, in which Drue purportedly admitted to the accusation." (ECF No. 84 at 6 (emphasis added) (citing ECF No. 3, ¶ 89)). The paragraph of the complaint to which they point, however, merely asserts that "in late 2024, documents began to surface, purportedly written by Drue, admitting to all of Brooks'[s] and Robinson's allegations. The language used in the documents bore similarities to Brooks'[s] writing and to Brooks'[s] previous lawsuits in which defendants admitted to all allegations against them." (ECF No. 3, ¶ 89). Nowhere in that sentence is there an allegation that Brooks actually drafted the documents, nor is there a reasonable inference for briefing purposes that "Brooks drafted [the] documents" based on Plaintiffs' conclusory assertions. Merely because counsel want the complaint to assert a fact does not grant them leeway to create unreasonable and unsupported inferences out of whole cloth, and Plaintiffs and their counsel are cautioned accordingly. *See* N.C. R. Civ. P. 11.

65. Plaintiffs also allege, however, that Brooks "threatened Drue with criminal charges, possible arrest, and public proceedings" and that he did so (i) without having already contacted law enforcement and (ii) with no intention of contacting law enforcement or having Drue arrested. (ECF No. 3, ¶¶ 132–36).

66. As Plaintiffs plead it, Brooks falsely threatened to have Drue charged and arrested—despite no intention to do so and despite the fact that Brooks was demanding that Drue transfer assets to Brooks, Winthrop, or other creditors well in excess of the amount owed to them. (ECF No. 3, ¶¶ 128–30).

67. In turn, "as a result of Brooks'[s] persistent and threatening actions, through which Brooks promised financial ruin and public humiliation, Drue took his own life." (ECF No. 3, ¶ 136).

68. In essence, accepting Plaintiffs' allegations as true, Brooks demanded that Drue transfer at least certain assets to which Brooks had no legal claim and threatened to have him charged and arrested if he did not do so. These are factual allegations that, if proven true, could amount to blackmail or extortion, among other things. *See* N.C. Gen. Stat. § 14-118 (setting forth elements of blackmail as (i) knowingly sending or delivering a written demand "with menaces and without any reasonable or probable cause" for delivery of chattels, money, or valuable security, or (ii) knowingly sending or delivering a written accusation (or threat to accuse) another of a crime punishable by death or imprisonment, with the intent to extort or gain chattels, money, or valuable security); N.C. Gen. Stat. § 14-118.4 ("Any person who threatens or communicates a threat or threats to another with the intention thereby

wrongfully to obtain anything of value or any acquittance, advantage, or immunity is guilty of extortion and such person shall be punished as a Class F felon.").

69. A party's threat of "criminal prosecution" does not necessarily rise to the level of extreme and outrageous conduct, but it is a fact-dependent determination. *Burton v. NCNB Nat. Bank of N.C.*, 85 N.C. App. 702, 707 (1987) ("Plaintiff contends the statement by Brown that NCNB was considering criminal prosecution for the filing of an inaccurate financial statement was extreme and outrageous conduct, intending to cause and causing severe emotional distress. We find the statement does not, *under the facts of this case*, exceed "all bounds usually tolerated by decent society." (emphasis added)). In *Burton*, for example, the court determined that telling the plaintiff's *attorney* that the defendant was considering the possibility of criminal prosecution was not, under those circumstances, intentional infliction of emotional distress. Here, on the other hand, Brooks allegedly threated Drue directly with prosecution.

70. The malicious use of otherwise public information may constitute intentional infliction of emotional distress. *Burgess v. Busby*, 142 N.C. App. 393, 400 (2001) ("Plaintiffs' allegations that defendant's action in writing a letter specifying names and addresses of Rowan County residents who performed their civic duty as jurors and in distributing the letter to every medical practitioner with hospital admitting privileges in Rowan County sufficiently alleges extreme and outrageous conduct.").

71. If the Court determines as a matter of law that the conduct "may reasonably be" regarded as extreme and outrageous, "then it is for the jury to decide whether, under the facts of a particular case, defendants' conduct . . . was in fact extreme and outrageous." *Norton*, 250 N.C. App. at 398 (citations and internal quotation marks omitted).

72. Here, while many of Plaintiffs' allegations standing alone might not state a claim, the Court determines that, construing the factual allegations in the light most favorable to the non-moving Plaintiffs, the circumstances pleaded adequately allege a claim for intentional infliction of emotional distress. Brooks's alleged conduct, in totality, was extreme and outrageous, and Brooks allegedly intended to cause severe emotional distress or otherwise acted recklessly in disregard of the probability of such distress. *Norton*, 250 N.C. App. at 398 (quoting *Dickens*, 302 N.C. at 449 (emphasis in original)). And, of course, Drue committed suicide based on those actions on 10 January 2025—the very day on which Brooks had demanded that Drue provide more information or face severe consequences. (ECF No. 3, ¶¶ 122, 136); *Soderlund v. Kuch*, 143 N.C. App. 361, 368 (2001) (recognizing that "shame, confusion, alcohol abuse, inability to form healthy relationships, inability to lead a normal life, several mental breakdowns, and contemplat[ion of] suicide" were forms of severe emotional distress sufficient to trigger a claim (citations and internal punctuation omitted)).

73. The Court therefore **DENIES** the Rule 12(b)(6) motion to dismiss as to Kelly Moore's cause of action, in her official capacity as executor of Drue Moore's estate, for intentional infliction of emotional distress.

ii. <u>Conversion</u>

74.    Since Brooks's motion was filed, Plaintiffs have voluntarily dismissed without prejudice the cause of action for conversion. (ECF No. 80). The Court therefore **DENIES AS MOOT** Brooks's motion to dismiss the conversion cause of action.

## III.   ORDER

75.    Accordingly, the Court hereby **DENIES** Brooks's motion to dismiss under Rule 12(b)(2) and Rule 12(b)(6) as set forth above.

**SO ORDERED**, this 23rd day of January 2026.

/s/ Matthew T. Houston

Matthew T. Houston
Special Superior Court Judge
 for Complex Business Cases